UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SALEEM MUHMMAUD,            :
        Plaintiff,          :
                            :           PRISONER
    v.                      :   CASE NO. 3:08-cv-1199 (VLB)
                            :
BRIAN MURPHY, et al.,       :
        Defendants.         :   November 19, 2009

MEMORANDUM OF DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [Doc. #53] AND GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT [Doc. #73]

Plaintiff Saleem Muhmmaud commenced this action pro se against

defendants Brian Murphy, Mary Marcial, Wayne Choinski, Fred Levesque, Ellen

St. John, Major Rose, Major Light, Major Rodriguez, Dennis Oglesby, Jeffrey

McGill, CTO Brown, Counselor McEwan, Yolanda Ortero, John Sieminski, Captain

Travaglin, James Dzurenda and Counselor McLeod.  Plaintiff moves for summary

judgment on his substantive due process and failure to protect claims.

Defendants have filed a cross motion for summary judgment on all claims,

namely, denial of substantive due process under the Fourteenth Amendment of

the U.S. Constitution and Article first, § 9 of the Connecticut Constitution, denial

of procedural due process under the Fourteenth Amendment, denial of equal

protection under the Fourteenth Amendment as a result of the decision not to

assign correctional officers to the Chronic Discipline recreation yard and an

associated claim under Article first, § 20, failure to protect plaintiff from harm

under the Fourteenth Amendment, and any Fourth Amendment claims.[1]  For the

reasons that follow, plaintiff's motion for summary judgment is DENIED and

defendants' motion for summary judgment is GRANTED in part and DENIED in

part.  The case will proceed to trial on plaintiff's substantive due process and

failure to protect claims.

I.      <u>Standard of Review</u>

        In a motion for summary judgment, the burden is on the moving party to

establish that there are no genuine issues of material fact in dispute and that it is

therefore entitled to judgment as a matter of law.  <u>See</u> Rule 56(c), Fed. R. Civ. P.;

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  The moving party may

satisfy this burden "by showing – that is pointing out to the district court – that

there is an absence of evidence to support the nonmoving party's case."

<u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam)

(internal quotation marks and citations omitted).  Once the moving party meets

this burden, the nonmoving party must "set forth specific facts showing that

there is a genuine issue for trial," <u>Anderson</u>, 477 U.S. at 255, and present such

evidence as would allow a jury to find in his favor in order to defeat the motion for

summary judgment.  <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).

        When reviewing the record, the Court resolves all ambiguities and draws

---

        [1]  On June 30, 2009, the Court granted defendants' motion to dismiss all
claims asserted under the Fifth, Eighth and Thirteenth Amendments of the U.S.
Constitution and Article first, § 8 of the Connecticut Constitution as well as the
state and federal equal protection claims regarding placement in the Chronic
Discipline Unit.  <u>See</u> Doc. #65.

all permissible factual inferences in favor of the party against whom summary judgment is sought.  Patterson v. County of Oneida, NY, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record on a material issue from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is inappropriate.  Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).  However, "'[t]he mere of existence of a scintilla of evidence in support of the [plaintiff's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [plaintiff].'"  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004) (quoting Anderson, 477 U.S. at 252)).

II.    Facts[2]

Plaintiff was an inmate at Northern Walker Correctional Institute, and was placed in the Department of Correction's Chronic Discipline Program.  This program provides for segregation of an inmate "whose behavior while incarcerated disrupts the normal operation of a facility by receiving repetitive disciplinary infractions" and who "can no longer be safely managed in general population."  Defs.' Local Rule 56(a)(1) Statement, Doc. #73-74, Ex. B at 16.  On November 28, 2006, after completing the Chronic Discipline Program, plaintiff was transferred from Northern Correctional Institution to MacDougall-Walker

---

[2] The facts are taken from the statements filed by both parties pursuant to D. Conn. L. R. 56(a)1 and (a)2 and the exhibits attached to the amended complaint and submitted in support of the motions for summary judgment.  See Docs. ##42, 62, 73, 76 and 77.

Correctional Institution.  On December 14, 2006, plaintiff received a Class A disciplinary report for interfering with safety and security.  He pled guilty to the disciplinary report and served sanctions of confinement in segregation for seven days followed by confinement to quarters.

A recommendation for inclusion in Department of Correction Administrative Directive 9.4 and a provision in the MacDougall-Walker Correctional Institution handbook provided that an inmate released from the Chronic Discipline Program is on probation for ninety days.  If he is found guilty of a Class A disciplinary report during the probationary period, he may be returned to the Chronic Discipline Program after a hearing.  The recommendation, however, has not been included in any version of Directive 9.4 in effect since the date of the incident for which plaintiff was disciplined.

On December 27, 2006, plaintiff was discharged from custody at the conclusion of his sentence.  At the time of his discharge, no hearing to determine whether he would return to the Chronic Discipline Program had been scheduled.  On January 10, 2007, plaintiff was re-arrested and confined in the custody of the Connecticut Department of Correction as a pretrial detainee.  He remained in this status until he was sentenced in July 2008.

Upon his readmission, correctional officials prepared a Chronic Discipline reinstatement package.  On February 5, 2007, plaintiff received notice of a Chronic Discipline hearing.  The hearing took place on February 7, 2007.  Defendant Travaglin, the hearing officer, did not check off the box on the

Restrictive Status Report of Hearing for Placement or Removal form indicating that he recommended placement in the Chronic Discipline Program.  However, he completed the section requesting reasons for placement, stating "Inmate discharged prior to completion of the CD program - was approved for CD on 12/21/06 due to Step-Down failure.  He was readmitted to the DOC on 1/10/07."  Am. Compl. Ex. C, Doc. #42-2, at 9.  Defendant Dzurenda denied plaintiff's appeal and, on February 22, 2007, defendant Levesque authorized plaintiff's placement in the Chronic Discipline Program.  Plaintiff was transferred to the Chronic Discipline Program at Northern Correctional institution on March 27, 2007.

Correctional guards at Northern Correctional Institute did not accompany Chronic Discipline inmates when they entered the recreation yard.  Instead, there were electronic intercommunication speakers on the wall and guards observed the inmates through a window.  On April 25, 2007, plaintiff attended morning recreation with five other inmates.  Inmate Battle made disrespectful comments to plaintiff.  In response, plaintiff twice told inmate Battle to shut up and moved away from him.  Inmate Battle then physically attacked plaintiff.  During the struggle, plaintiff secured a weapon that inmate Battle had brought to the recreation yard and swung the weapon at him.  Correctional officers did not immediately respond to the assault.  The record does not indicate the duration of the correctional officers' delay in responding.  Plaintiff suffered lacerations on his upper forehead, right eye, lips and knees and swollen lips and eyes.  Prior to the incident, plaintiff had not informed any correctional staff of a problem with inmate

Battle.

III.   **Discussion**

    A.   **Substantive Due Process Claims**

Plaintiff alleges that he was denied substantive due process when, upon readmission to the Department of Correction, he was reassigned to the Chronic Discipline Program as a result of events that occurred before he was discharged upon completion of his initial term of incarceration.

Plaintiff's claim regarding his transfer to the Chronic Discipline Program is based on the Supreme Court's holding that pretrial detainees have a substantive due process right not to be housed under conditions of confinement that amount to punishment.  See Bell v. Wolfish, 441 U.S. 520, 535-37 (1979).  Not every restriction imposed during pretrial detention, however, constitutes punishment in the constitutional sense.  Unless there is evidence of an expressed intent to punish on the part of correctional officials, a particular condition or restriction that is reasonably related to a legitimate governmental objective, such as maintaining institutional order and security, will not be considered punishment. In evaluating whether a restriction constitutes punishment or has a legitimate alternative purpose, the Court must determine whether the restriction may rationally be connected to the alternative purpose and whether it appears excessive in relation to the identified alternative purpose.  See id. at 538-40.

All legitimate intrusive prison practices can be attributed to one or more of three penological objectives:  "the preservation of internal order and discipline,

**6**

the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." Procunier v. Martinez, 416 U.S. 396, 412 (1974) (footnote omitted).  Certain penological objectives, such as punishment, deterrence, and rehabilitation, are legitimate in regard to convicted prisoners but are inapplicable to pretrial detainees.  See Houchins v. KQED, Inc., 438 U.S. 1, 37 (1978); United States v. Hearst, 563 F.2d 1331, 1345 n. 11 (9th Cir. 1977) ("[A] pretrial detainee may assert his status as a shield against intrusive practices aimed solely at rehabilitation but not against practices aimed at security and discipline."), cert. denied, 435 U.S. 1000 (1978).

Chronic Discipline is defined as segregation of an inmate "whose behavior while incarcerated disrupts the normal operation of a facility by receiving repetitive disciplinary infractions" and who "can no longer be safely managed in general population."  Defs.' Local Rule 56(a)1 Statement, Doc. #73-4, Ex. B at 16. The program

> operates on the basic assumption that inmates who engage in disruptive and/or defiant behavior pose a risk to the public, staff and other inmates.  These inmates pose a threat to the normal operation of a correctional facility and because of this risk are placed in a highly structured and secure environment.  Within this environment, inmates are held accountable for their action while learning coping skills necessary to allow their safe return to general population.

Id.

The current version of Administrative Directive 9.4 provides that when inmates previously on Chronic Discipline status are readmitted, the inmate will be

**7**

reviewed for continuation on that status and a hearing will be held within fifteen days of readmission.  See Administrative Directive 9.4, § 17 (modified 9/2/2009) (www.ct.gov/doc/LIB/doc/PDF/AD/ad0904.pdf last visited Oct. 13, 2009).  No provision for continuation of restrictive housing status upon readmission was included in the version of Directive 9.4 in effect when plaintiff was readmitted to custody in January 2007.

Plaintiff argues that his transfer to the Chronic Discipline Program was not related to any behavior following his readmission in January 2007.  He contends that his assignment to the Chronic Discipline Program was intended as punishment for misbehavior during his previous term of imprisonment or as rehabilitation, both impermissible purposes.  He notes that he did not receive any disciplinary reports following his readmission and had been given a prison job before the February 7, 2007 hearing.  See Defs.' Resp. to Requests for Admission, Doc. #62-5, at 5, ¶ 21 (admitting that plaintiff was not found guilty of any disciplinary charges between 1/10/07 and 4/5/07); Inmate Trust Account Statement, Doc. #62-5, at 35 (showing payment for prison job prior to Chronic Discipline hearing); Defs.' Local Rule 56(a)2 Statement, Doc. #73-3, at 2, ¶ 20 (admitting plaintiff has a prison job prior to transfer to Chronic Discipline Program).

Plaintiff has attached to his complaint a copy of a May 21, 2007 letter from defendant Light explaining his return to the Chronic Discipline Program.  Defendant Light stated that plaintiff received a Class A disciplinary report while in

**8**

the Step-down Program.  Pursuant to Administrative Directives 6.14 and 9.4, inmates leaving Northern Correctional Institution are placed on a ninety-day probationary period.  Behavioral violations during this period may result in the inmate's return to the previous Administrative Classification.  <u>See</u> Doc. #42-2 at 17.  Plaintiff states that although he was informed that the transfer was being done pursuant to department policy, he could find no reported policy.  In addition, he was not informed in December 2006, when he completed the Chronic Discipline Program, that he would be on probation for ninety days.  Defendant Light did not address why a decision made before plaintiff was discharged and of which he was unaware was used to classify him upon readmission, nor did he identify any authority supporting this action.

Plaintiff has not provided the versions of the referenced directives in effect in January 2007.  He alleges, and the Court has confirmed, that the version of the directive in effect at the time of his transfer did not reference continuing a previous Chronic Discipline Program placement upon readmission or a probationary or step-down period following release from the program.  Plaintiff alleges that he had completed the Chronic Discipline Program before he was discharged and was not made aware of any actions to return him to the program before his discharge date.  Thus, he argues that, in 2007, the defendants were not relying on department policy for his transfer but were punishing him.

Plaintiff also relies on the portion of the program description referencing holding inmates accountable for past behavior and teaching coping skills to

9

show that the program is intended as punishment and rehabilitation.  Defendants, on the other hand, rely on the language referencing the threat to institutional safety in the description to show that the program is intended to maintain institutional security.

The issue in this case is not whether a pretrial detainee can be assigned to the Chronic Discipline Program, but whether a pretrial detainee can be reassigned to the Chronic Discipline Program based on events occurring before his admission to custody as a pretrial detainee and absent any Administrative Directive or procedure authorizing such placement.  Defendants do not argue that plaintiff met the criteria for assignment to the Chronic Discipline Program based upon his conduct as a pretrial detainee.  Rather, they concede that he was transferred back to the Chronic Discipline Program for a disciplinary infraction that occurred while plaintiff was serving the probationary period following his completion of the program while serving a prior sentence of incarceration in December 2006.

Defendants have submitted an excerpt from a MacDougall-Walker Correctional Institution Inmate Handbook, dated August 2006, which includes the probationary or step-down period requirement.  The parties have also submitted a June 2006 form requesting the inclusion of  a description of the mandatory probationary period following completion of the Administrative Segregation, Close Custody, Close Monitoring and Chronic Discipline Programs in Administrative Directives 6.14 and 9.4.  Directive 9.4, however, has never been

amended to include that provision.  Directive 6.14 does include a mandatory probationary period for inmates in the Close Custody Program who renounce membership in a Security Risk Group.

Because Directive 9.4 has not been amended in over three years to include this requirement and the handbook provision relies on the directives, the Court questions whether a mandatory probationary or step-down period following release from the Chronic Discipline Program is official correctional policy.  In addition, there is no mention in the handbook excerpt or the directives of the applicable procedures when an inmate discharges from custody while in the probationary or step-down period.  Nor is there any reference to a probationary or step-down period in the description of the Chronic Discipline Program.  Plaintiff had completed the Chronic Discipline Program and had not been scheduled to appear at a hearing to determine whether he should be returned to the program prior to being discharged from custody on December 27, 2006.

The Court concludes that the absence of any applicable recorded policy creates a genuine issue of material fact regarding plaintiff's eligibility for return to the Chronic Discipline Program.  In addition, the absence of any conduct warranting placement in the Chronic Discipline Program following plaintiff's readmission creates a genuine issue of material fact regarding whether such assignment is a restriction inherent in confinement and the needs of orderly prison administration or an additional restriction, unrelated to guaranteeing institutional security, that would constitute punishment.  Accordingly, both

11

motions for summary judgment are denied on plaintiff's federal and state substantive due process claims.

      **B.**    <u>**Procedural Due Process Claim**</u>

      Plaintiff also challenges the procedures used to classify him to the Chronic Discipline Program in 2007.  He argues that any classification in 2007 is invalid because he was not afforded a hearing in 2006 before he was recommended for return to the Chronic Discipline Program.  He further contends that the paperwork following the February 2007 hearing was not properly completed and that his advocate recommended his return to the Chronic Discipline Program.

      When a court is presented with a procedural due process claim by a pretrial detainee, it should first determine whether the alleged deprivation is punishment, thereby implicating the Due Process Clause.  If so, the court must then determine what process is due.  As the Court has concluded above, there is a genuine issue of material fact regarding whether plaintiff's classification to the Chronic Discipline Program constitutes punishment.  Because action constituting punishment triggers more procedural protections than action that is merely administrative, the Court assumes, for purposes of deciding defendants' motion for summary judgment only, that plaintiff's classification and transfer to the Chronic Discipline Program constitutes punishment.

      Before a pretrial detainee may be punished, he must be afforded the procedural protections set forth in <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974).  The detainee cannot be punished until after a hearing is held.  He must be afforded

**12**

written notice of the charges at least twenty-four hours before the hearing and the opportunity to present witnesses and evidence in his defense. He also must be provided a written statement of the reasons for the decision. See id. at 564-66; Benjamin v. Fraser, 264 F.3d 175, 189-90 (2d Cir. 2001) (distinguishing the procedural requirements for punitive action from the lesser requirements for administrative action of some notice of the charges and an opportunity to present his views to prison officials deciding whether to impose restraints).

Plaintiff first argues that he was classified to the Chronic Discipline Program immediately upon readmission. He relies on the December 2006 reclassification form approving his return to the Chronic Discipline Program. See Defs.' Local Rule 56(a)1 Statement, Doc. #73-4, Ex. A. Plaintiff's assertion is incorrect. Although defendant Levesque concurred with the reclassification recommendation in December 2006, plaintiff was not actually reclassified to the Chronic Discipline Program until February 22, 2007, two weeks after the classification hearing. Plaintiff was transferred to Northern Correctional Institution, where the Chronic Discipline Program is located, one month later. See Defs.' Local Rule 56(a)1 Statement, Doc. #73-4, Ex. C & Doc. #73-5, Ex. L. Thus, plaintiff was not classified as a Chronic Discipline inmate and transferred to the Chronic Discipline Program until after he was afforded a hearing.

The hearing was held on February 7, 2007. Plaintiff received notice of the hearing on February 5, 2007, twenty-four hours before the hearing. The hearing notice indicates that plaintiff was afforded an advocate and declined to present

**13**

any witnesses.  See Doc. #73-5, Ex. J.  The hearing report summarized the evidence relied upon for the decision to reclassify plaintiff to the Chronic Discipline Program and indicates that plaintiff presented his arguments against reclassification.  See Doc. #73-5, Ex. K.  Although the hearing officer failed to check the space on the form indicating he recommended classification to the Chronic Discipline Program, he did explain his reasons for placement.  The form clearly indicates that the recommendation was for, not against, classification.  The Court concludes that the lack of a check mark did not deprive plaintiff of procedural due process.

Plaintiff also argues that his advocate was ineffective because she stated at the hearing that he should be returned to the Chronic Discipline Program.  Thus, he contends that he was unable to defend against the charge.  Plaintiff provides no evidence to support this claim.  The hearing report clearly states that plaintiff's arguments were presented and rejected.

Finally, plaintiff argues that he was denied procedural due process in December 2006 because he did not receive a hearing on the recommended return to the Chronic Discipline Program before he was discharged from custody on December 27, 2006.  The Second Circuit has held that the appropriate remedy for a due process violation is due process.  See U.S. ex rel Bey v. Conn. State Bd. of Parole, 443 F.2d 1079, 1089-90 (2d Cir. 1971) (concluding that proper remedy for improper parole revocation hearing was new revocation hearing), vacated on other grounds by, Conn. State Bd. of Pardons v. Bey, 404 U.S. 879 (1971).

**14**

Plaintiff received a classification hearing before he was reclassified and transferred to the Chronic Discipline Program.  Thus, he has no cognizable claim for denial of procedural due process arising in December 2006.

After reviewing the evidence submitted by the parties, the Court concludes that plaintiff was afforded the procedural protections required by <u>Wolff</u> before his transfer to the Chronic Discipline Program.  Accordingly, defendants' motion for summary judgment is granted on the procedural due process claim.[3]

C.    <u>Failure to Protect Claim</u>

Plaintiff argues that the defendants failed to protect him from assault by another inmate because they did not assign correctional staff to go into the recreation yard with the inmates in the Chronic Discipline Program.  Defendants move for summary judgment on this claim on two grounds:  1) failure to state a cognizable failure to protect claim, and 2) failure to exhaust administrative remedies.

The standard for addressing a failure to protect claim by a pre-trial detainee is the same as the Eight Amendment standard applied to an inmate's

---

[3] **Defendants also argue that plaintiff was afforded procedural due process at disciplinary hearings.  Neither in his motion for summary judgment nor in opposition to defendants' motion has plaintiff addressed any procedural due process claims relating to a hearing other than the classification hearing. Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the non-movant does not address the argument in any way.  <u>See, e.g.</u>, <u>Douglas v. Victor Capital Group</u>, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases).  Thus, to the extent that other procedural due process claims were included in the amended complaint, the Court considers those claims abandoned.**

failure to protect claim.  <u>See</u> <u>Caiozzo v. Koreman</u>, No. 05-4002-cv, 2009 WL 2998338, at *9 (2d Cir. Sept. 22, 2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment.").  In <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994), the Supreme Court articulated the proper standard for addressing these claims under the Eighth Amendment.  In light of the Second Circuit's direction in <u>Caiozzo</u>, the Court applies the Eighth Amendment standard articulated in <u>Farmer</u> to plaintiff's Fourteenth Amendment failure to protect claim.

Under <u>Farmer</u>, prison officials have a duty to make reasonable efforts to ensure inmate safety.  This duty includes protecting inmates from harm at the hands of other inmates.  <u>See</u> <u>id.</u> at 832; <u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d Cir. 1997).  To establish a constitutional violation, a prisoner must show that the conditions of his incarceration posed a substantial risk of serious harm and that the prison official was deliberately indifferent to his safety.  <u>See</u> <u>Farmer</u>, 511 U.S. at 834.  Deliberate indifference exists where the official both knows of and disregards an excessive risk to inmate safety.  <u>See</u> <u>id.</u> at 837.  For example, correctional staff would be on notice of a substantial risk of serious harm where there has been prior hostility between inmates, or a prior assault by one inmate on another, and those inmates are not kept separated.  <u>See, e.g.</u>, <u>Ayers v. Coughlin</u>, 780 F.2d 205, 209 (2d Cir. 1985).

**16**

Plaintiff argues that the defendants were aware of the assaultive tendencies of all inmates in the Chronic Discipline Program.  He provides no evidence regarding the disciplinary history of inmate Battle or any other Chronic Discipline inmate.  Instead, he appears to base his argument on the description of the Chronic Discipline Program and his observation that assaults had occurred among unidentified inmates.  This is insufficient to establish that the defendants were on notice as to the violent tendencies of the inmates in the recreation yard with plaintiff.  See  Farmer, 511 U.S. at 842-43 (stating "if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk'") (citations omitted); see also Johnson v. Lantz, No. 3:04cv903(CFD), 2005 WL 3448055, at *5 (D. Conn. Dec. 8, 2005) (holding fact that inmate was an alleged gang member and was recently transferred from the restrictive housing unit was insufficient to put correctional staff on notice of the danger posed by inmate).

Even if such an inference could be made, plaintiff has provided no evidence that any defendant drew the inference of excessive risk to plaintiff's health or safety from the facts he presents.  Plaintiff conceded at his deposition that he never had a problem with inmate Battle and had not advised correctional

**17**

staff about any potential problem.  See Defs.' Local Rule 56(a)1 Statement Ex. F,

Tr. pages 72-73, Doc. #73-4 at 56-57.  Absent evidence showing that any named

defendant was aware of any problem between plaintiff and inmate Battle or of any

threat to plaintiff's safety, there is no genuine issue of material fact concerning

the failure to protect claim as applied to the decision not to place correctional

officers in the recreation yard.

This, however, does not end the inquiry.  Plaintiff also contends that the

defendants did not render assistance for a period of time after the assault began.

Plaintiff stated during his deposition that, when inmate Battle began verbally

harassing him, he tried to contact the supervising officer by pressing the

intercommunication button, but was ignored.  See Doc. #73-4 at 59, Transcript[4]

page 75.  The incident report notes that inmate Battle punched plaintiff twice, the

two inmates fought and grappled with each other, a weapon fell out of inmate

Battle's pant leg, the inmates struggled over the weapon, and plaintiff obtained

control of it.  Plaintiff then broke away from inmate Battle.  The fight continued

with plaintiff thrusting the weapon at inmate Battle who kept backing away.  After

plaintiff struck inmate Battle with the weapon, correctional staff entered the

recreation yard and separated the inmates.  See Pl.'s Mem. Ex. ZZ, Doc. #76 at 75.

As a result of the assault, plaintiff suffered swelling and lacerations on his

forehead, eyes, lips and knees and was retained in the medical department after

---

[4]  Defendants submitted only selected pages of the transcript.  Although
they cite additional pages regarding the altercation in their Local Rule 56(a)1
Statement, they did not submit those pages.

**18**

treatment.  <u>See</u> Pl.'s Mem. Ex. J#100, Doc. #62-5 at 56-57.

In response, defendants submit the affidavit of Correctional Officer Martinez,[5] who states that he was standing inside the housing unit watching the recreation yard through the window.  <u>See</u> Defs.' Mot., Doc. #73, Ex. M, ¶ 4.  He observed the altercation begin at 8:50 a.m., and called a code to summon assistance when he saw the inmates exchanging blows with closed fists.  <u>See</u> <u>id.</u>, ¶¶ 5-6.  All available staff responded and helped defuse the situation.  <u>See</u> <u>id.</u>, ¶ 7.

Prison officials have a duty to provide reasonable safety for inmates.  Thus, they have a duty to respond appropriately once they are aware of a substantial risk of serious harm.  <u>See</u> <u>Farmer</u>, 511 U.S. at 844.  Courts considering these claims emphasize the length of time until correctional officers respond to inmate-on-inmate assaults.  <u>See, e.g.</u>, <u>Wilkerson v. Johnson</u>, 330 Fed. Appx. 257, 259 (2d Cir. 2009) (affirming grant of summary judgment in favor of correctional officers where they responded "immediately" to defuse inmate fight); <u>Loggins v. Franklin County, Ohio</u>, 218 Fed. Appx. 466, 471 (6th Cir. 2007) (holding no failure to protect claim where officials did not know of any threat or danger to inmate and responded quickly to inmate-on-inmate assault); <u>McDaniels v. McKinna</u>, 96 Fed. Appx. 575, 580 (10th Cir. 2004) (holding correctional officer's slow reaction to inmate fight where officer lacked prior knowledge of specific threat to plaintiff's safety and entire incident lasted three minutes constituted at most negligence and did not support deliberate indifference claim); <u>but see</u> <u>Williams v. Mueller</u>, 13

---

[5]  **Correctional Officer Martinez is not a named defendant.**

**19**

F.3d 1214, 1216 (8th Cir. 1994) (holding that, under most circumstances, "[a] prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault."); <u>Jenkins v. Tauanuu</u>, No. CV 07-5115-ODW(RNB), 2008 WL 975076, at *5 (C.D. Cal. Apr. 7, 2008) (holding, in rejecting claim of qualified immunity, that "no reasonable prison official could have believed that it was lawful to fail to intervene for several minutes after having witnessed one inmate shove another inmate into a cell").

Defendants do not provide any evidence demonstrating their response time. The incident report suggests that a significant amount of time elapsed before any correctional staff entered the recreation yard. The absence of any evidence documenting the response time creates a genuine issue of material fact preventing entry of summary judgment for either party on the failure to protect claim.

Defendants also contend that plaintiff failed to exhaust his administrative remedies with respect to this claim. Prisoners are required to exhaust their administrative remedies before commencing an action in federal court and must comply with all procedural rules regarding the grievance process. <u>See</u> <u>Woodford v. Ngo</u>, 548 U.S. 81, 85 (2006).

The administrative remedies for the Connecticut Department of Correction are set forth in Administrative Directive 9.6, entitled Inmate Administrative Remedies. <u>See</u> Administrative Directive 9.6, Section 6,

**20**

http://www.ct.gov/doc/LIB/doc/PDF/AD/ad0906.pdf (last visited October 29, 2009).

Individual employee actions, matters relating to conditions of care or supervision, and complaints concerning prison life are grievable.  An inmate must first seek informal resolution of the issue verbally and by inmate request.  If informal resolution is unsuccessful, the inmate must file a Level 1 grievance.  If the Level 1 grievance is denied or if correctional officials fail to respond timely, the inmate must appeal the denial to Level 2.  Failure to respond timely to a Level 2 grievance entitles the inmate to file a Level 3 grievance.

Plaintiff has submitted a copy of his April 26, 2007 Inmate Request Form and Level 2 and Level 3 grievances indicating that he did not receive responses to any prior submissions.  See Pl.'s Mem., Doc. #79-2 at 4-6.  The Court concludes that plaintiff has demonstrated compliance with the grievance process.  Accordingly, both motions for summary judgment are denied on the failure to protect claim.

D.   Fourth Amendment Claims

Plaintiff states in the first paragraph of the amended complaint that he brings this action pursuant to the Fourth Amendment.  Defendants argue that the Fourth Amendment is not applicable to any of his remaining claims.

The Fourth Amendment applies to pretrial detainees in limited circumstances.  Although pretrial detainees retain a Fourth Amendment right protecting them from unreasonable strip searches, see Bell, 441 U.S. at 558, challenges to conditions of confinement are addressed under the Fourteenth

**21**

Amendment.  See, e.g., Benjamin v. Frazier, 343 F.3d 35, 49 (2d Cir. 2003) (holding

that detainee's challenge to environmental conditions of confinement were

properly reviewed under Fourteenth Amendment); Lee v. State of New York Dep't

of Correctional Services, No. 97 Civ. 7112(DAB), 1999 WL 673339, at *11, (S.D.N.Y.

Aug. 30, 1999) (acknowledging that pretrial detainee's failure to protect claim was

properly considered under Fourteenth Amendment).

The Court can discern no claim in the amended complaint that would

properly be considered under the Fourth Amendment.  Accordingly, defendants'

motion for summary judgment is granted as to any Fourth Amendment claims.

E.      Federal and State Equal Protection Claims

Plaintiff contends that his state and federal rights to equal protection were

violated because correctional officers were not present in the recreation yard for

Chronic Discipline inmates while they are present in the recreation yard for

Administrative Segregation inmates.

The Equal Protection Clause protects prisoners from invidious

discrimination.  This provision does not mandate identical treatment for each

individual; rather it requires that similarly situated persons be treated the same.

See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439-40 (1985); see also

Kerrigan v. Comm'r of Pub. Health, 289 Conn. 135, 158, 957 A.2d 407, 421-22

(2008) (applying same standard under state equal protection clause).

Plaintiff alleges that inmates in the Chronic Discipline Program are treated

differently from inmates in the Administrative Segregation Program with regard to

**22**

the presence of correctional officers in the recreation yard, even though both groups include inmates identified as violent or difficult to control.  In response, defendants argue that inmates in the Chronic Discipline Program and the Administrative Segregation Program are not similarly situated.  They note that there are greater restrictions on inmates in the Administrative Segregation program and that failure to complete the Chronic Discipline Program is one basis upon which an inmate can be assigned to the Administrative Segregation Program.

The Administrative Segregation Program description states that inmates are assigned to Administrative Segregation if their "behavior while incarcerated poses a threat to the security of the facility or a risk to the safety of staff or other inmates."  These inmates are described as engaging in "aggressive, violent, disruptive behavior" or posing "an imminent risk to the public, staff, or other inmates."  Chronic Discipline inmates, on the other hand, are those "whose behavior while incarcerated disrupts the normal operation of a facility by receiving repetitive disciplinary infractions."  They are described as engaging in "disruptive and/or defiant behavior" and posing "a risk to the public, staff and other inmates."  In addition, inmates in Phase I of the Administrative Segregation Program are in full restraints whenever they leave their cells.  Inmates in Interval I of the Chronic Discipline Program are not restrained when they leave their cells.  Defs.' Local Rule 56(a)1 Statement, Doc. #73-4, Ex. B at 12, 16.  The program descriptions indicate that Chronic Discipline inmates are not considered violent

**23**

and aggressive and are subject to a lower level of restrictions.  Thus, they are not similarly situated with Administrative Segregation inmates.  Plaintiff has provided no evidence, and has pleaded no particularized facts, to contradict the program descriptions.

Since plaintiff has failed to demonstrate that Administrative Segregation and Chronic Discipline inmates are similarly situated, his equal protection claims necessarily fail.  Defendants' motion for summary judgment is therefore granted on plaintiff's equal protection claims.

F.    Qualified Immunity

Finally, defendants argue that they are protected by qualified immunity.

The doctrine of qualified immunity protects government officials from liability for damages caused by the performance of discretionary official functions if their conduct does not violate a clearly established right of which a reasonable person would have been aware.  See Zellner v. Summerlin, 494 F.3d 344, 367 (2d Cir. 2007).

When considering a claim of qualified immunity, the Court considers two questions:  1) whether, construing the facts in favor of the non-moving party, there is a violation of a constitutionally protected right; and 2) whether, considering the facts of the case before it, that right was clearly established at the time of the incident.  Qualified immunity is warranted unless the state official's conduct violated a clearly established constitutional right.  See Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 813, 815-16 (2009) (setting forth qualified

**24**

immunity test and holding that a court need not consider the questions in any particular order).  To evaluate whether a right is clearly established, the Court must determine whether it would be clear to a reasonable correctional official that his conduct in these circumstances was unlawful.  See Saucier v. Katz, 533 U.S. 194, 202 (2001).

Defendants contend that they did not have an intent to punish plaintiff and were following established prison protocol by proceeding to reclassify him to the Chronic Discipline Program upon readmission.  Thus, they argue that it would not be clear to a reasonable correctional officer that the actions were unlawful.  The Court has concluded that there is a genuine issue of fact regarding whether defendants had an intent to punish plaintiff and whether there was an established protocol in this circumstance.  Until those issues are resolved by the trier of fact, the Court cannot determine whether a reasonable correctional officer would understand his conduct to be unlawful.

Defendants also argue that they have no duty to prevent violence when they were not on actual notice that violence may occur.  As discussed above, defendants also have a duty to respond reasonably to instances of inmate-on-inmate violence even where they did not have prior warning.  Defendants do not address this duty in their assertion of qualified immunity for the failure to protect claim.  Therefore, defendants' motion for summary judgment on the basis that they are protected by qualified immunity is denied.

IV.     <u>Conclusion</u>

Plaintiff's Motion for Summary Judgment [Doc. #53] is DENIED.

Defendants' Motion for Summary Judgment [Doc. #73] is GRANTED as to any

Fourth Amendment claims, the federal procedural due process claim and the

federal and state claims for denial of equal protection.  The motion is DENIED in

all other respects.  This case will proceed to trial on the plaintiff's substantive

due process claims and the failure to protect claim.

Plaintiff's Motion to Address the Issues [Doc. #78], Motion for Court

Consideration [Doc. #82] and Motion to Enter New Information [Doc. #83] are

GRANTED.  The Court has reviewed all documents submitted by plaintiff in

support of his motion.  Plaintiff's Motion to Dismiss [Doc. #79] is DENIED as

moot.  The Court did not dismiss plaintiff's failure to protect claim.

IT IS SO ORDERED.

_____/s/_____

Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  November 19, 2009.

26